J-A09008-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1489 WDA 2024 |

Appeal from the Order Entered November 13, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000047-2024

BEFORE: KUNSELMAN, J., NICHOLS, J., and LANE, J.

MEMORANDUM BY KUNSELMAN, J.:          **FILED: June 10, 2025**

A.M. (Father) appeals from the order granting the petition filed by the Allegheny County Office of Children, Youth and Families (the Agency), which involuntarily terminated his parental rights to his now two-year-old son, A.M. (Child), pursuant to the Adoption Act.[1] **See** 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), (b). After review, we affirm.

---

[1] The orphans' court also involuntarily terminated the rights of S.K. (Mother), who was not present at the termination hearing, and the "Unknown Father." Neither Mother nor any unknown father appealed. Although Mother identified Father as the Child's father, he did not sign an acknowledgement of paternity. **See** N.T., 11/8/24, at 9-10. As explained *infra*, paternity was never established in this case. **See id.** at 10-11. At the end of the termination hearing, the court also changed the Child's permanency goal to adoption. **See id.** at 170. No parent appealed the goal change.

In its Appellate Rule 1925(a) opinion, the orphans' court provided the following factual background, which we reproduce in relevant part:[2]

> The Child [. . .] was born on March 16, 2023 to Mother [. . .]. Child's father is not named on the birth certificate; however, Mother named A.M. as Father. Paternity in this matter has not been established.
>
> Child has been under the care of the [Agency] [since] March 22, 2023 pursuant to an Emergency Custody Authorization ("ECA"). KidsVoice was appointed to be Child's Guardian *Ad Litem* ("GAL"). [The Agency] received a report that Child tested positive for narcotics at the time of his birth. Child was placed in the Neonatal Intensive Care Unit ("NICU") for withdrawal symptoms. Mother admitted that she used cocaine and heroin. [The Agency] spoke to Father following the removal of Child. Father was in an inpatient drug and alcohol facility in Mt. Joy, PA. Father told [the Agency] he was not in a position to care for Child due to his treatment status at the facility.
>
> Child was referred to Alliance for Infants for developmental screens and Swan Services for child preparation and the child profile. The reason for the referral was due to Child being born premature. Therefore, Child required screening to determine if additional services were needed in the event he was developmentally behind. Child profile was referred to create a life book for Child to reflect at a later time when he would be able to read it.
>
> Child was adjudicated dependent on May 10, 2023. Following a hearing on [the Agency's] petition, the court found that clear and convincing evidence existed to substantiate the allegations set forth in [the Agency's]

_____

[2] We note that the certified record on appeal does not include the exhibits that were admitted into evidence at the termination hearing. However, the record includes the hearing transcript. Thus, our appellate review was not impeded. Nonetheless, we remind Father and his counsel that it is ultimately the appellant's responsibility to ensure that the record is complete on appeal to enable our appellate review. *See* Pa.R.A.P. 1921, Note.

petition. The court determined Child was without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.

The court found that to allow Child to remain in the home would be contrary to Child's welfare and that reasonable efforts were made by [the Agency] to prevent or eliminate the need for removal of Child from the home.

In March 2023, Child was placed in [the] Wesley Family Services foster home of [Foster Mother] where he currently remains. [Foster Mother] is Child's medical and educational decision maker.

The court ordered the following: legal and physical custody remained with [the Agency]. Child's placement was to remain in foster care; Child was to participate with Alliance for Infants tracking; [and] Child was provided a care taker, [Foster Mother.] [. . .] Father was ordered to participate in the recommended level of [drug and alcohol ("D&A")] treatment; Father was ordered to undergo random urine screens; Father was ordered to sign releases of information ("ROI"); complete genetic testing; present himself for a full assessment by [the Agency] for services and visitation; and Father was ordered to maintain contact with [the Agency].

[The Agency] made referrals for Father to assist him in completing his goals. [The Agency] referred Father to a Father Engagement Specialist to assist him with treatment needs as well as [sending him] ROI[s], in December 2023, February 2024, and again in October 2024, none of which were returned to the [A]gency.

[The Agency] arranged scheduled visitation for Father and Child. At Father's request, the visits were to occur on Saturdays in Pittsburgh. [The Agency] scheduled thirteen (13) total visits, none of which occurred because of Father's lack of confirmation.

[The Agency] held five (5) family plan meetings to assist both parents in meeting their goals. The purpose of the meetings [is] for the parents to achieve not only the court

ordered goals, but also identifying personal goals set for themselves. The parents would identify individuals that would work together to help parents achieve those goals. Father did not attend any of the family plan meetings.[3]

The [A]gency attempted contact with Father in regards to genetic testing and the previously emailed ROI(s) so that the [A]gency could provide verification of treatment status. [The Agency] inquired into the reason why Father did not undergo genetic testing. Father did not provide a reason. [The Agency] set up testing in both Pittsburgh and also in Lancaster, PA based on Father's request. Father confirmed that he received the notice provided by [the Agency], but never showed.

[The Agency] had concerns about Father's open criminal cases. Father had four charges for public intoxication at the time following Child's birth. Two of the four charges remained open at the time of the [termination] hearing. [For] [t]he other two charges[,] Father entered guilty pleas. The charges caused [the Agency] concern for Child's safety because Father allegedly completed treatment and they wanted confirmation by having Father complete an updated assessment so he could demonstrate a level of sobriety. Additionally, [the Agency] was not able to assess Father's housing due to his residence in Lancaster, PA and Lancaster County would not complete a courtesy home assessment.

On May 8, 2024, an aggravated circumstances petition for Father was litigated and the court entered an order granting the petition. The court found that Father failed to comply with any of the ordered goals. Father removed himself from Allegheny County and moved to Lancaster, PA. Father did not complete genetic testing. Father testified and acknowledged at the [aggravated circumstances] hearing that he had been asked by [the Agency] for over a year to take the test, but would only do so if it was not "overly burdensome" and did not require him to "take a day off of work".

---

[3] We clarify that the Agency casework supervisor testified that Father was invited to three of the family plan meetings. *See* N.T. at 24. She confirmed that he did not attend any of those meetings. *See id.*

- 4 -

The court held numerous Permanency Review hearings throughout the lifetime of this case and concluded that Father made no progress towards the ordered goals for reunification.

On May 23, 2024, [the Agency] filed its Petition for Involuntary Termination of Parental Rights. The [termination] hearing was held on November 8, 2024.[4] Father appeared via "TEAMS" from Lancaster, PA. Following the hearing, the court issued its order terminating Mother and Father's parental rights to Child.

_____

[4] As noted, KidsVoice was appointed to be the Child's GAL during the dependency proceedings. *See* Orphans' Court Opinion, 12/18/24, at 3-4. KidsVoice then represented the Child as legal counsel at the termination hearing. Counsel has filed a participant's brief on the Child's behalf in this appeal, advocating for this Court to affirm the termination order.

Our Supreme Court has mandated that appellate courts *sua sponte* "verify that the orphans' court indicated that the attorney [in a dual role of GAL and legal counsel] could represent the child's best interests and legal interests without conflict." *In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020); *see also* 23 Pa.C.S.A. § 2313(a). Counsel representing a child's legal interests must advocate for the child's preferred outcome even if counsel does not agree with it, whereas the GAL representing a child's best interests must express what he or she "believes is best for child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees." *In re T.S.*, 192 A.3d 1080, 1082 n.2 (Pa. 2017) (citation omitted).

Here, in its order appointing KidsVoice as legal counsel for the Child, the orphans' court found "that no conflict exists that would prevent KidsVoice from accepting this appointment." Order Appointing Legal Counsel for a Child in a TPR Proceeding, 8/1/24. Further, as of the termination hearing, the Child was approximately one year and eight months old, and his counsel noted that he was non-verbal and unable to state a position. *See* N.T. at 165; *see also T.S.*, 192 A.3d at 1088 ("[W]here a child is too young to express a preference, it would be appropriate for the GAL to represent the child's best and legal interests simultaneously.") (citations omitted). As such, we find that the orphans' court fulfilled the mandate of *K.M.G.* and Section 2313(a).

[. . .]

At the time of the [termination] hearing, Child had been in [the Agency's] care since March 23, 2023. Child never was in the care of Father and/or Mother. Father neither complied nor made progress with any of the stated goals.

Orphans' Court Opinion (O.C.O.), 12/18/24, at 3-10 (footnotes omitted).

Father timely filed this appeal. He presents the following two issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that [the Agency] met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the [C]hild pursuant to 23 Pa.C.S. §2511(b)?

Father's Brief at 3.

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving . . . the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); *see also T.S.M.*, 71 A.3d at 267. Furthermore, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re*

***C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting ***Matter of***

***Adoption of Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

***In re C.M.K.***, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted);

***see also Interest of M.E.***, 283 A.3d 820, 830 (Pa. Super. 2022).

As noted, the orphans' court terminated Father's rights under Section

2511(a)(1), (2), (5), (8), and (b). As we may affirm under any ground under

Section 2511(a), we review the court's decision as to Section 2511(a)(1).

That subsection provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

Accordingly, termination under Section 2511(a)(1) is appropriate if Father has either evidenced a settled purpose of relinquishing his parental claim, or if Father has refused or failed to perform parental duties. In either event, Father's offending conduct must have been continuing for a period of at least six months immediately preceding the filing of the termination petition. *See id.*

Here, the termination petition was filed in May 2024; thus, the statutory timeframe to examine Father's actions began in November 2023. Our Supreme Court has "reinforce[d] the view that the six-month period immediately preceding the filing of the petition is the *most* critical period to evaluate for affirmative conduct or its absence . . . ." *In re Adoption of C.M.*, 255 A.3d 343, 367 (Pa. 2021) (citation omitted) (some emphasis in original). "The trial court must examine the individual circumstances of each case and consider all of the explanations of the parent to decide if the evidence, under the totality of the circumstances, requires involuntary termination." *In re I.J.*, 972 A.2d 5, 10 (Pa. Super. 2009) (citing *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005)).

Regarding parental duties, we have explained that:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, . . . the parental obligation is a positive duty which requires affirmative performance.

***B.,N.M.***, 856 A.2d at 855 (citation omitted).

Furthermore,

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

***Id.*** (internal citations omitted).

Once a settled purpose of relinquishing parental rights or a failure to perform parental duties is established, "the court must engage in three lines of inquiry: (1) the parent's explanation for [the parent's] conduct; (2) the post-abandonment contact between [the] parent and [the] child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citing ***Charles E.D.M., II***, 708 A.2d at 92).

Here, the orphans' court determined that the Agency had proven the statutory grounds for terminating Father's rights under Section 2511(a)(1). The court explained:

> With respect to Father's appeal under 23 Pa.C.S.A. §2511(a)(1), the record clearly demonstrates that paternity had never been established. Father's contact with Child ceased when he left Allegheny County upon Child's birth and relocated to Lancaster, Pennsylvania, nearly 238 miles from Child. Father did not inquire about Child; nor did he send

- 10 -

any type of support, gifts, or cards to Child. Father did not present any testimony or evidence to refute these facts.

[The Agency] had scheduled genetic testing for Father on seven (7) occasions in Pittsburgh as well as Lancaster, at Father's request, and he failed to attend any of the scheduled appointments.

Instead, Father testified that he never received any letters from [the Agency] notifying him of the scheduled genetic tests. The court finds this assertion to lack credibility and rejects this excuse. Father stated in his testimony "I'm not signing up or doing nothing with no kids until I find out it's mine."

Father failed to maintain his [drug and alcohol] goal. At the time of Child's birth, Father was in an inpatient rehabilitation facility. Although no releases of information were ever returned by Father, [the Agency] indicated that they were concerned that Father's addiction issue [was] not being addressed as he had four public intoxication cases throughout the course of this case.

Father minimized the severity of this issue. Father failed to acknowledge the serious impact that substances had on his parenting duties. Instead, Father once again excused his conduct and stated that "I ain't commit no crimes. I didn't attack nobody when I was drunk. I just had a couple of drinks. I'm quite sure a lot of people have public intoxication charges over the last year that they wasn't picked up for."

The court therefore finds that the record demonstrates that [the Agency] satisfied their burden as it pertains to 23 Pa.C.S.A. §2511(a)(1).

O.C.O. at 14-16 (footnotes omitted).

On appeal, in only four sentences of argument, Father asserts that there was not clear and convincing evidence to terminate his rights under Section 2511(a)(1). *See* Father's Brief at 13. Father states that he "made repeated

- 11 -

attempts to stay involved in the case and traveled great distances to attend [c]ourt and attempt to set up a visit with the Child. He also maintained contact with [the Agency] and attempted to resolve issues with getting Genetic Testing established." *Id.* at 13.

Father's argument is unavailing. He cites nothing in the record, nor any case law, to support his assertions. Additionally, his argument misapprehends the statutory requirements under Section 2511(a)(1) and fails to appreciate our standard of review in termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. *See T.S.M.*, 71 A.3d at 267 (citation omitted).

Our review of the record supports the orphans' court's decision. For the entirety of the case, and especially during the six-month statutory period at issue (November 2023 to May 2024), Father evidenced a settled purpose of relinquishing his parental claim or refused or failed to perform parental duties.

For termination under Section 2511(a)(1), this Court has previously clarified that "[t]he most critical question . . . is when [f]ather knew or should have known of [c]hild's existence, and the possibility that he was [c]hild's father." *In re Adoption of B.G.S.*, 245 A.3d 700, 707 (Pa. Super. 2021). Further, "[i]f a father knows or has reason to know of a child's existence, he need not have conclusive proof of his paternity before the relevant six-month period begins." *Id.* at 707 n.2 (citing *Z.S.W.*, 946 A.2d at 731).

Here, the Agency supervisor testified at the termination hearing that Mother identified Father as the Child's father. N.T., 11/8/24, at 9. The Agency spoke to Father about the Child at the time of the Child's removal in March 2023, and he stated that he was unable to care for the Child because he was in inpatient treatment. *See id.* at 14-15. Father confirmed at the hearing that he was aware that the Child was in placement. *Id.* at 153.

The Agency scheduled genetic testing for Father seven times, in both Lancaster and Pittsburgh, at Father's request. *Id.* at 11. Father failed to attend any of the scheduled appointments, even though he was notified ahead of time and indicated that he was going to attend. *See id.* at 11, 78. Although Father testified that he never received letters from the Agency about the genetic testing, the orphans' court found that Father lacked credibility, and the court rejected his excuses. *See* O.C.O. at 15. Further, the orphans' court found aggravated circumstances against Father in May 2024 for failing to maintain contact with the Child and comply with any of his ordered goals. *See id.* at 8, 16; *see also* N.T. at 12. As of the termination hearing, Father had not completed any of his court-ordered or family plan goals. *See* N.T. at 25.

Thus, Father knew of the Child, and the possibility that he was the father, since shortly after the Child's birth, when Mother identified him as the father and the Agency contacted him. Yet as of the termination hearing, approximately twenty months after the Child was placed, Father had yet to take a paternity test and had never even met the Child. *See id.* at 151. The

law does not allow Father to wait for a positive paternity test before performing any parental duties; not having a positive test does not excuse Father's complete lack of contact with the Child for the Child's entire life. **See B.G.S., supra.**; **see also Z.S.W.**, 946 A.2d at 731.

Additionally, Father claims that he attempted to set up a visit with the Child. **See** Father's Brief at 13. At the hearing, Father testified that "I almost feel like a victim here because I'm trying -- I came down there two weeks, three weeks ago to see the baby. No one showed up. . . . I came down there, tried to visit with the baby. No one showed up." N.T. at 144. He also testified that he talked to someone at the Agency "all the time" about trying to get visits. **See id.** at 155. Conversely, the Agency supervisor testified that Father requested for visits to occur on Saturdays in Pittsburgh. **Id.** at 21-22. The Agency scheduled thirteen visits, but Father did not attend any of them. **See id.** at 22, 78, 81.

Even if we accept Father's claim that he drove to Pittsburgh to visit the Child, he testified that he did so two or three weeks prior to the termination hearing. **See id.** at 144. Thus, this occurred well after the relevant six-month period ended and the termination petition was filed in May 2024. **See** 23 Pa.C.S.A. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.").

We reiterate that the orphans' court, as the factfinder, was free to believe all, part, or none of the evidence presented and to make credibility determinations. *See M.G., supra*. The court clearly found that Father lacked credibility. We cannot reweigh the evidence. Because the orphans' court's findings are supported by the record, we must accept them. *See T.S.M., supra*. Father's first issue merits no relief.

Father's second issue challenges the orphans' court's findings under Section 2511(b), the second part of the bifurcated analysis in termination of parental rights cases. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

The "determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," but "courts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted); *see also C.M.K.*, 203 A.3d at 261-62 (the focus of Section 2511(a) is the conduct of the parent, whereas the focus of Section 2511(b) is the best interests of the child).

- 15 -

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare.'" ***K.T.***, 296 A.3d at 1105. It is well-established that the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." ***Id.*** at 1106 (citing ***T.S.M.***, 71 A.3d at 267). Our Supreme Court also requires courts to consider, not only whether the children have a bond with their biological parent, but also whether the children are in a pre-adoptive foster home and whether they have a bond with their foster parents. ***Id.*** (citing ***T.S.M.***, 71 A.3d at 268; ***In re D.C.D.***, 105 A.3d 662, 677 (Pa. 2014)).

Here, the orphans' court concluded that terminating Father's parental rights was in the Child's best interest. The court explained:

> In reaching the conclusion to terminate Father's parental rights pursuant to 2511(b), the court heavily relied on the record as a whole. In the instant matter, the court had no evidence of any bond between Father and Child due to Father leaving Pittsburgh and relocating to Lancaster; Father's lack of any contact with Child during his absence; and Father's refusal to engage with any of the services required for family reunification. Although repeated paternity tests were scheduled for Father, he failed to submit to testing. The court rejected Father's vow to cooperate with services, pending a paternity test, as disingenuous.
>
> The court also weighed [Foster Mother's] ability to care for Child and their interactions. The court further examined the extent of Child's individual needs and welfare in the context of his autism diagnosis.

Dr. O'Hara [who conducted evaluations in this case] testified about the bond he observed between Child and [Foster Mother] and noted a positive and secure attachment. [Foster Mother] was observed to be engaged and playful with Child. She expressed willingness to have contact between Child and his biological family if requested. She redirected Child. She was vocal and engaged in the appropriate developmental activities with Child.

Dr. O'Hara opined that a child has relational or experiential understanding about who his caregiver is by said caregiver being a secure, safe, stable presence for Child. Disrupting that would cause a significant psychological detriment to Child.

Considering the record on this issue, Father failed to present any credible evidence to demonstrate a bond with Child. Father has not assumed any parental role to demonstrate that he can or is willing to meet the needs and welfare of Child. Father testified that he currently lives with his paramour, a Lancaster County CYF employee, and her child; and yet Father fails to progress in the responsibility of caregiving for his Child. Father may not preserve parental rights [by] waiting for a more suitable time to perform parental duties. Father's self-imposed delay for paternity testing has been rejected by this court as legitimate rationale for not parenting. Father's willful ignorance does not alleviate his responsibility to parent Child. It is notable that Father also had two scheduled forensic evaluations that he failed to attend.

In contrast, the court finds that a strong and positive bond does exist with [Foster Mother]. The court further finds that the relationship between [Foster Mother] and Child is loving, stable and provides Child security. The court also finds no bond exists between Father and Child. Father has already relinquished or abandoned all parental responsibility, leaving [the Agency] and/or foster parents to care for Child. Father has had no engagement into the day-to-day care of Child, medical appointments or therapies related to his new diagnosis of autism.

Child deserves permanency and has been in care for twenty (20) months. Father has never had Child in his care. Courts must keep in mind the ticking clock of childhood. [. . .] The court finds that a strong and positive bond does exist with

- 17 -

[Foster Mother]. The court further finds that the relationship between [Foster Mother] and Child meets his needs and welfare, and that termination of Father's parental rights is in the Child's best interests.

[. . .]

Therefore, the evidence established that termination will be able to provide Child with much needed stability and permanence at his age and this court concludes that the developmental, physical, and emotional needs and welfare of Child would be best served by terminating Father's parental rights under 2511(b).

O.C.O. at 22-25 (footnotes omitted).

On appeal, Father argues that there was insufficient evidence to prove that terminating his parental rights best serves the needs and welfare of the Child. *See* Father's Brief at 16. Father claims that "[t]he record clearly established that the Child and Father could share an important bond if given appropriate opportunity to meet." *Id.* at 17. Further, Father asserts that "[t]he Child deserves to have the benefits of a potential relationship with Father preserved. The only way to ensure this benefit to the Child is to restore Father's parental rights." *Id.*

Father's argument is unavailing. He, again, cites nothing in the record to support his assertions. Additionally, he misapprehends the requirements under Section 2511(b) and fails to appreciate our standard of review.

Here, the record supports the orphans' court's findings. The Child has never met or interacted with Father. *See* N.T. at 78, 151. "In cases where there is no evidence of any bond between the parent and child, it is reasonable

to infer that no bond exists." **In re Adoption of C.P.D.**, 324 A.3d 11, 27 (Pa. Super. 2024) (citation omitted). Further, Father does not argue that he currently shares a bond with the Child. Instead, Father asserts that they **could** share an important bond if given the chance to meet. **See** Father's Brief at 17 (emphasis added). However, as noted above, Father made no effort to meet the Child prior to the termination petition being filed. It is well-settled that "a child's life 'simply cannot be put on hold in the hope that [the parent] will summon the ability to handle the responsibilities of parenting.'" **Z.S.W.**, 946 A.2d at 732 (citation omitted).

Additionally, witnesses testified at the hearing that the Child is bonded to Foster Mother, who he has been placed with since shortly after his birth, and to his sibling who also resides in the foster home.[5] **See** N.T. at 32-33, 83, 132-33. There were signs of a positive and secure attachment between the Child and Foster Mother. **See id.** at 55. Foster Mother meets all the Child's needs. **See id.** at 31-33, 44, 116, 132.

Thus, there was competent evidence to support the orphans' court's decision to terminate Father's parental rights under Section 2511(b). Because the record supports the orphans' court's findings, we must accept them. **See T.S.M., supra**. Father's second issue merits no relief.

---

[5] The sibling is not the subject of this appeal but was another child of Mother's who was previously adopted by Foster Mother. It does not appear that the sibling was Father's child.

- 19 -

In sum, we discern no abuse of discretion or error of law in the orphans' court's decision to terminate Father's parental rights under Section 2511(a)(1) and (b) of the Adoption Act.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/10/2025